**CASCADIA WILDLANDS PROJECT, et al., Plaintiffs,**

v.

**Linda GOODMAN, et al., Defendants.**

**No. Civ.04–1424–HO.**

United States District Court, D. Oregon.

Dec. 20, 2004.

Stephanie M. Parent, Susan Jane M. Brown, Pacific Environmental Advocacy Center, Portland, OR, for Plaintiffs.

Stephen J. Odell, United States Attorney's Office, Julie A. Weis, Scott W. Horngren, Haglund Kirtley Kelley & Horngren, LLP, Portland, OR, Paul D. Barker, Jr., US Department of Justice Ben Franklin Station, Washington, DC, for Defendants.

## Order

HOGAN, District Judge.

The first amended complaint alleges violations of the National Environmental Poli-

cy Act and National Forest Management Act related to the Davis Fire Recovery Project. Plaintiffs move for an order enjoining the project pending resolution of the merits of their claims.

### Background

The Davis Fire burned approximately 21,000 acres in an area roughly ten miles west of LaPine, Oregon during late June and early July, 2003. Davis Fire Recovery Final Environmental Impact Statement (EIS) 1–2–3. Approximately 56% of the fire occurred within the Davis Late Successional Reserve (LSR). EIS 1–4. The Forest Service determined that "complete mortality" resulted on approximately 15,-600 acres. EIS 1–3. The Service identified a need to accelerate reforestation to meet objectives of the Davis LSR. EIS 1–6. Forest Supervisor Leslie Weldon decided to implement alternative B as described in the EIS, with minor modifications. Record of Decision (ROD) at 1. Proposed actions include 6,355 acres of commercial salvage logging, 8,400 acres of reforestation, including salvage units, 1,450 acres of fuels treatments outside of salvage units, and construction of eleven miles of temporary roads. EIS 2–30. Determining an emergency situation exists due to potential loss of value to the government, Regional Forester Linda Goodman exempted four salvage timber sale components of the project from the usual stay of decisions that are appealed to the Service. Defs' Exs. 5 & 7.

### Discussion

■ Plaintiffs will be entitled to an injunction if they demonstrate a sufficient degree of irreparable harm, considering the likelihood they will ultimately succeed on their claims, and whether the public interest favors an injunction. *See United States v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir.1992).

**I.** *Likelihood of Success on Merits*

 **A.** 1st Claim—NEPA: Range of Alternatives

■ Plaintiffs argue that the Service failed to consider a project alternative that would initially abstain from intervening in the post-fire landscape, but would leave open the option of fuels reduction treatments if future conditions warrant, perhaps beginning in ten, thirty or sixty years. *See* Pls' Memo. at 9. This alternative is not so likely to have consequences dissimilar to the no-action alternative that separate NEPA analysis is required. *See Headwaters v. Bureau of Land Management*, 914 F.2d 1174, 1181 (9th Cir.1990).

 **B.** 2nd Claim—NEPA: Impacts to Soils

Plaintiffs argue defendants underestimated direct and indirect effects on soils for several reasons, and failed to assess cumulative effects of the Five Buttes Interface[1] and Crescent Lake Wildland Urban Interface projects.

 ·1. Direct and Indirect Effects

 a. Burning of Slash Piles

■ Plaintiffs argue the Service does not disclose and discuss in the EIS detrimental soil conditions that will result from burning slash piles generated by commercial logging activities. The EIS states that studies show dramatic increases in soil pH below burn piles for up to "10 cm soil horizons," nitrogen concentrations in these horizons is not reduced due to downward distillation of organic nitrogen from the burn piles and possibly from oxidation of nitrogen from roots in the top horizons, few studies have monitored long-term recovery of soil underneath burn piles, soil below burn piles may be depleted in nutrients and organic matter for a period of

---

**1.** Formerly known as the Seven Buttes Return Project.

years, affected areas would vary unit by unit but generally would average less than 2% of unit areas, and most burn piles would occur on existing skid trails and landings. EIS 3–97–98. The Service provided some quantified information and a reasoned analysis. Moreover, the area where slash burning will occur has experienced high intensity wildfire. The court is ultimately likely to find the Service's analysis sufficient.

### b. Vagueness Re: Detrimental Soil Conditions

Plaintiffs next argue that it is impossible to determine from the EIS whether predicted quantities of detrimental soil conditions in table B–1 of appendix B assume the implementation of planned mitigation measures. In text referring to table B–1, the EIS discloses that the subsoiling[2] mitigation measure will be applied in 20 activity units where the cumulative effects of project activities combined with past and foreseeable future actions could result in exceeding the standard and guideline amount (20%) of detrimental soil conditions in an activity area. EIS 3–96. The table itself indicates that subsoiling is planned for units with predicted detrimental soil conditions in excess of 20%. It appears to the court from the text and the table that the Service did not subtract acres planned for the subsoiling mitigation measure from the predicted quantities of detrimental soil conditions. Deschutes National Forest (DNF) Soil Scientist Peter Sussman confirms that table B–1 lists predicted percentages of detrimental soil conditions before implementation of mitigation measures. Sussman Decl., ¶ 3.

Plaintiffs similarly fault the table for stating a "range class" of existing detrimental soil conditions for each unit, in addition to the percentage of existing detrimental soil conditions. The court finds nothing improper about this.

### c. Scale of Analysis

Plaintiffs argue defendants limited their analysis of project effects on soils to the largest two subwatersheds within the project area, and failed to analyze effects at the timber sale unit level as required by the DNF Land and Resource Management Plan (RMP). The Service provided some separate analysis and data for the Odell Creek and Davis Lake subwatersheds for the stated reason that these subwatersheds contribute to perennial or intermittent streams. EIS 3–69. It is plain from the body of the EIS (EIS 3–96) and table B–1 of appendix B that the Service analyzed existing conditions and predicted detrimental effects on soils for each harvest unit.

### d. Misleading Use of Appendix B

■ Plaintiffs complain that the Service misleads the public by hiding information on individual harvest units in the appendix. The court disagrees. At oral argument, counsel for the Service asserted that the Service located table B–1 in the appendix because of its size. That justification is reasonable, considering that table B–1 is nearly three pages long. Moreover, the table is accurately summarized in the body of the EIS in text that refers the reader to the table. EIS 3–96. Plaintiffs' cited authority does not prohibit the Service from using an appendix in this manner.[3]

---

**2.** The EIS refers to "subsoiling" as a treatment for relieving compacted soil. EIS 2–37. Former Forest Soil Scientist George Badura states that subsoiling breaks up or mixes soil, and is accomplished by a tractor pulling equipment with three foot shanks lowered into the soil. Badura Decl., ¶ 6.

**3.** *Lands Council v. Powell,* 379 F.3d 738, 749 (9th Cir.2004); *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214 (9th Cir.1998).

#### e. Omission of Road System

██ Plaintiffs argue the Service did not account for existing and planned temporary roads in assessing effects on soils, in contravention of a requirement of the RMP. The RMP directs the Service to include all system roads, landings, spur roads and skid roads or trails in evaluating impacts to soils from compaction, displacement, puddling and burning. RMP 4–70, SL–3. "Activity area" includes transportation systems within and adjacent to a project. RMP 4–71, n. 1.

The Service asserts it accounted for existing roads in assessing existing and predicted conditions. A note under table 3.1 supports the Service's position, with respect to the analysis for subwatersheds contributing to streams. EIS 3–70. The Service does not point to other portions of the EIS disclosing whether it considered existing roads in determining existing and predicted conditions elsewhere in the project area, including for each timber sale unit. On the other hand, plaintiffs point to no evidence that the Service did not comply with the guideline. In the absence of contrary evidence, and considering the evidence of how the Service prepared table 3.1, the court presumes at this stage that the Service complied with this particular guideline directive in preparing table B–1. EIS B–2–4, EIS 3–90.

With respect to temporary roads, the EIS discloses that for alternative B, most of these roads would utilize existing skid trails, with some improvement—primarily widening with a dozer blade. EIS 3–90. DNF Soil Scientist Sussman states he did not consider temporary road construction associated with alternative B in his soil analysis because he assumed that 100% of the temporary roads would overlap existing or new skid trails. Sussman Decl., ¶ 6. He further states that the road engineer recently informed him that in fact two to six acres of new ground may need to be disturbed for temporary road construction on the entire project, but this amount of soil disturbance falls within the range of disturbance estimated on a unit by unit basis in table B–1, and would not change his analysis of effects on soil disturbance from road construction. Sussman Decl., ¶ 6. The court is likely to ultimately find this error of insufficient magnitude to invalidate the analysis of effects on soils.

#### 2. Cumulative Effects

██ Plaintiffs next argue that the Service failed to consider effects of the Five Buttes Interface Project and the Crescent Lake Wildland Urban Interface Project, both of which plaintiffs argue may increase detrimental soil conditions in combination with the Davis Project. In its discussion of cumulative effects on water quality, the EIS identifies these projects as foreseeable and adjacent or nearby. EIS 3–310. DNF Soil Scientist Sussman states that the projects do not overlap, and that the harvest prescriptions for the Five Buttes Interface Project were not sufficiently developed to determine their effects on soils at the time the Service prepared the Davis Project EIS. Sussman Decl., Sussman Decl., ¶ 9.

The discussion of effects on soils is primarily concerned with productivity affected by soil disturbing events such as fire, application of chemicals, compaction and displacement. EIS 3–65. The Service's logic that adjacent activities do not act synergistically with project activities to impact soil productivity is reasonable. Plaintiffs have not demonstrated that the Service should have considered the cumulative effects of the project on soils, along with the other identified projects. Secondary effects of detrimental soil conditions on vegetation and water quality, for example, may require analysis at the subwatershed or watershed level, but plaintiffs direct this

claim primarily at direct effects on soils, especially productivity. The court finds that plaintiffs are not likely to ultimately prevail on this argument.

### C. 3rd Claim—NFMA: RMP Soil Standards

■ Plaintiffs argue that the project violates the RMP's prohibition against detrimental soil compaction, displacement, puddling, and severe burning on more than 20% of an "activity area." *See* RMP at 4–70. Where this guideline cannot be met, the RMP requires rehabilitative measures, which may include, *inter alia*, tillage. *Id.* Relying on the declaration of former Forest Service Soil Scientist George Badura, plaintiffs argue that 46 salvage units presently exceed the 20% guideline level, an additional 35 units will reach the level as a result of project activities, and seventeen units will exceed the level post-project. Plaintiffs do not explain Badura's numerical conclusions, which are purportedly gleaned from table B–1. Table B–1 indicates that five units presently have levels exceeding 20% detrimental soil conditions, twenty units will exceed the 20% level before subsoiling, and each of these units is scheduled for subsoiling. EIS B–2–4; Sussman Decl., ¶ 5.

Badura also explains why subsoiling does not rehabilitate compacted, displaced, burned or puddled soil, particularly when used on the Mazama ash and pumice soil in the project area. He cites his own experience and a report entitled "Assessing the Sub–Soiling Within the Upper Chewaucan Watershed." The report concludes that subsoiling does not ameliorate compacted soil conditions in the study area, and in fact has deleterious effects. Badura Decl., Ex. B at 10. Plaintiffs also

argue that planned subsoiling may not occur if there is insufficient funding.

The cited portion of the EIS does not support the latter contention. Reforestation and mitigation measures have the highest priority for timber sale funds, but may be funded by other means, such as appropriated funds, "to insure that requirements are accomplished." EIS 2–42. The EIS discusses the limitations and benefits of subsoiling on the Deschutes National Forest in four paragraphs at EIS 3–97, citing to two studies. The Service points to a statement in the report relied on by plaintiffs that the "[Chewaucan monitoring] team is not performing scientific research." Badura Decl., Ex. B at 10. The RMP does not require instantaneous restoration to pre-disturbance conditions. RMP 4–70–71. "Tillage" is among the permitted rehabilitative measures, and the term would seem to include subsoiling, as that term is used by the parties.[4] *Id.*, SL–4.

As noted, the court presumes at this stage based on the limited evidence that the Service complied with the requirement to count existing roads in analyzing detrimental soil conditions. Although Sussman failed to consider two to six acres of temporary road construction, the error is not material, as it did not affect his analysis. The Service assures that additional subsoiling will be employed if necessary to ensure compliance with the RMP. Sussman Decl., ¶ 8; RMP 4–70. The court is likely to find no NFMA violation with respect to RMP soil standards.

### D. 4th Claim—NEPA: Impacts to Critical Habitat Function

■ Plaintiffs allege defendants violated NEPA by failing to discuss how salvage logging in Critical Habitat Unit (CHU)

---

**4.** Merriam Webster's defines "tillage" as the operation of tilling land. "Till" is defined in part as "to work by plowing, sowing, and raising crops." *Merriam Webster's Collegiate Dictionary* 1234 (10th ed.1996).

OR7 will affect the recovery of the northern spotted owl. The portion of CHU OR–07 within the Davis Fire perimeter (7,292 acres) is also within the Davis LSR. EIS 3–202. The Service concluded that salvage of dead trees in areas of 100% tree mortality will have no effect on the northern spotted owl, because surveys completed to June 30, 2004 failed to disclose the presence of owls, and studies show that surviving owls are displaced to the nearest available habitat after a 71–100% canopy-killing fire. EIS 3–205, 223. The Service further concluded that salvage and reforestation will hasten development of northern spotted owl habitat, and that treated areas should feature dispersal habitat within 30–40 years, thus providing a long-term benefit to northern spotted owls. EIS 3–223. Because salvage operations are confined to areas with 100% tree mortality, which no longer function as owl habitat, defendants reasonably determined it was unnecessary to analyze effects of salvage operations on the functioning of the CHU, apart from hastening redevelopment of LSH within the LSR.

### E. 5th Claim—NFMA: NWFP LSR Salvage Guidelines

■ Plaintiffs argue that defendants' snag retention scheme[5] and planned salvage harvest activities violate directives of the Northwest Forest Plan (NWFP) that (1) management activities in LSRs following stand-replacing events should focus on retaining snags likely to persist until late-successional conditions return and stands again produce large snags, and (2) salvage operations should not diminish habitat suitability now or in the future. *See* NWFP C–13–14. Specifically, plaintiffs argue that harvest of snags between 20 and 36 inches dbh results in the loss of snags likely to persist, and diminishes suitable woodpecker habitat now and in the future.

The court does not read the guidelines to require the Service to retain all snags likely to persist until the return of late-successional conditions and natural large snag recruitment. The Service does not plan to harvest all large snags, and the court is deferential to the Service's considered scientific conclusion that its scheme will retain sufficient snags to accommodate wildlife needs until the return of natural large snag recruitment. *See Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife,* 273 F.3d 1229, 1236 (9th Cir.2001).

Plaintiffs are correct that the Service concluded that proposed salvage activities will negatively affect species that favor present conditions over the relative short term. The Service also concluded, however, that the project will accelerate development of dispersal habitat, whereas the no-action alternative will foster the slowest recovery of suitable dispersal habitat. EIS 3–100, 155, 158. The guidelines contemplate that active management may foster a return to late-successional conditions and diminish the possibility of future stand-replacing events while permitting removal of some commercial wood volume. NWFP C–13–14. To the extent there is an inherent conflict in the NWFP's simultaneous directives to manage salvage logging in LSRs to foster the redevelopment

**5.** According to the EIS, snag harvest will occur in areas of 100% mortality. In areas of low snag density, all snags will be retained. Harvest of snags will not occur within designated high density leave areas, consisting of 15% of the area of each harvest unit. All snags 36 inches in diameter and greater will be retained in all units. EIS 3–102. The Service has devised a snag retention scheme it concludes will achieve desired diversity of snag size and clumping and meet or exceed LSR and NWFP requirements, including the requirement to retain snags likely to persist until stands again produce large snags for wildlife needs. EIS 3–101–02; EIS D–1–3.

**1050**

of late-successional habitat and to diminish no habitat now or in the future, the Service's resolution of the competing objectives is reasonable. The Service has concluded that planned activities will meet NWFP objectives, and its conclusions are entitled to deference. EIS D–4.

### F. 6th Claim—NEPA: Failure to Prepare Supp. Documentation

■■■ Plaintiffs next argue the Service violated NEPA by failing to prepare supplemental environmental analysis addressing new information contained in a September, 2004 report of the Sustainable Ecosystems Institute (SEI), commissioned by the United States Fish and Wildlife Service (FWS), entitled "Scientific Evaluation of the Status of the Northern Spotted Owl."[6] An agency must supplement an EIS if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). Plaintiffs contend the report contains a recommendation against salvage logging in post-fire environments, particularly within LSRs. Supervisor Weldon found that the SEI report does not constitute relevant significant new information requiring supplementation under NEPA regulations. Defs' Ex. 14.

Plaintiffs cite to several portions of the report. Pls' Reply at 10. On one cited page, the report may state that legacy retention can foster development of foraging and roosting habitat and a diverse prey base, although the court is not completely confident it correctly reads the confusing sentence.[7] Defs' Ex. 15 at 4–24. Elsewhere, the report states,

> Management activities designed to accelerate development of new habitat are becoming an important part of forest management. Retention of legacy (snags and course woody debris) in current areas of timber harvest will shorten the time necessary for those areas to achieve the habitat complexity deemed to be suitable Northern Spotted Owl habitat.

Defs' Ex. 15 at 6–8. And,

> NWFP predicts that recovery of the Northern Spotted Owl will require provision of new habitat, through succession. There are no new data to suggest that this habitat strategy is incorrect or that it will be insufficient in the long term. Indeed, much of the new habitat that is currently coming "on line" is the result of unsalvaged wildfires in the 19th and 20th century that typically has significant biological legacies from the original old-growth stands and should, therefore, have attributes of suitable habitat.

Defs' Ex. 15 at 9–14. On the crest and west of the Cascade Range the reserve system was designed to accommodate habitat losses from large disturbance events, although in the driest portions of the owl's range, primarily east of the Cascade Range, planned proactive fuel measures have not been undertaken at the scale that was expected and such treatments need to be accelerated to assure the continued ex-

---

**6.** FWS commissioned the report in conjunction with their five-year summary and evaluation of the northern spotted owl. FWS issued the five-year review after briefing was completed on plaintiffs' motion for preliminary injunction. Counsel for plaintiffs advises that the FWS report contains similar information as the SEI report, and additional briefing is not necessary.

**7.** However, with legacy retention, patchy regeneration of multiple species including hardwoods, and natural disturbances during the periods following either a natural catastrophic disturbance by wind or fire or following partial cuts, the prey base can reach or exceed levels of diversity and abundance found in many old-growth stands and will be used for foraging and roosting by spotted owls. Defs' Ex. 15 at 4–24.

istence of owl habitat in these areas. Defs' Ex. 15 at 9–12. "The LSR network was also designed to accommodate the large-scale disturbances that are characteristic of the region and to allow natural recovery processes when disturbances occur." Defs' Ex. 15 at 9–17.

The Service points to other portions of the report.

More aggressive active management will be necessary in late-successional forests and landscapes, which are at risk of uncharacteristic stand-replacement fires, if there is an intent to reduce the current potential for large losses of suitable ... habitat.[8]

Defs' Ex. 15 at 9–16. "In general, conservation strategies for the Northern Spotted Owl are based on sound scientific principles and findings, which have not substantially altered since the ... adoption of the [NWFP] (1994)." Defs' Ex. 15, Exec. Summ. "Largely the successes of the NWFP are ascribable to good design and implementation. The inadequacies seem more to do with implementation ..." Def's Ex. 15, 9–15

 The portions of the SEI report submitted for the court's review essentially affirm the habitat scheme established in the NWFP, and the authors profess to make no management recommendations. Defs' Ex. 15, Exec. Summ. Plaintiffs are correct that the authors at times emphasize the importance of retaining snags and legacy materials. This is consistent with the NWFP, and plaintiffs identify no portion of the report condemning the NWFP's scheme permitting salvage logging in LSRs in compliance with guidelines. The court is likely to ultimately determine that the Service's decision not to prepare supplemental NEPA analysis was not arbitrary and capricious. *See Westlands Water District v. United States Department of the Interior,* 376 F.3d 853, 873 (9th Cir.2004) (stating standard of review). Plaintiffs also seem to suggest that Forest Supervisor Weldon violated NEPA by determining the insignificance of the SEI report in a letter, as opposed to a "supplemental information report" (SIR). Neither NEPA nor regulations promulgated by the Council on Environmental Quality require the Service to issue an SIR, rather than a letter. *Idaho Sporting Congress v. Alexander,* 222 F.3d 562, 566 (9th Cir. 2000).

G. 7th Claim—NEPA: Documentation for ESD Regulations

 Plaintiffs next argue that the Service's "emergency situation determination" (ESD) exempting four timber sales from the usual stay for administrative appeals is unlawful because the Service did not prepare NEPA documentation before issuing the regulations that permit the ESD. The court has previously found this argument unavailing. *See Oregon Natural Resources Council Fund v. Goodman,* 04–593–HO (D.OR.), Order dated June 22, 2004 at 6. Plaintiffs' authority, *Citizens for Better Forestry v. United States Department of Agriculture,* 341 F.3d 961 (9th Cir.2003), does not demand a different result. That case simply holds that the plaintiffs had standing to challenge regulations, including one that altered an administrative appeal process. *Id.* The court will follow its ruling in the *ONRC* case.

H. 8th Claim—NFMA: Failure to Provide Notice of ESD

 Plaintiffs next argue that even if the ESD regulations are otherwise valid,

---

**8.** The report lists mechanical treatment and prescribed fire as possible useful management tools. Defs' Ex. 15, 9–16. The report further states that mechanical and prescribed fire fuel treatments may be essential on the eastern slopes of the Cascade Range, but are not appropriate in certain forests in western Oregon and Washington. *Id.*

the Service failed to notify the public that it would request an ESD, or that an emergency existed, as allegedly required by 36 C.F.R. § 215.5(b)(1)(iii). The regulation requires legal notices of proposed actions to include a statement that the responsible official is seeking an emergency situation determination, or that it has already been determined that an emergency situation exists as provided in 36 C.F.R. § 215.10, when applicable. 36 CFR § 215.5(b)(1)(iii). The Service submitted the declaration of District Ranger Phillip Cruz, who states that he did not decide to seek an emergency situation determination until July, 2004, after he consulted with the Forest Supervisor and reviewed the draft EIS. Based on this evidence, the requirement to provide notice of intent to seek an ESD was not applicable at the time the Service published notice of the proposed action. Plaintiffs point to no regulation requiring the Service to decide whether to seek an ESD prior to publishing legal notice of the proposed action.

### I. 9th Claim—NEPA: Failure to Disclose Info. re: ESD

█ Plaintiffs last argue that the Service violated NEPA by failing to include the information that provided the basis for the ESD within the EIS. The court is likely to ultimately conclude that the Regional Forester's ESDs are not major federal actions significantly affecting the quality of the human environment, so that the Service was not required to include this information in the EIS. *See* 42 U.S.C. § 4332(2)(C). The ESDs affect the timetable for implementation of portions of the project. 36 C.F.R. § 215.10(c). Plaintiffs do not dispute the Service's evidence that the Service sent them letter notification, dated August 6, 2004, of the Service's intent to seek an ESD (Cruz, Decl., ¶ 6) and do not argue that the timetable has precluded them from mounting a timely court challenge. In these circumstances, changing the timetable for implementation does not significantly affect the environment.

### II. *Degree of Irreparable Harm/Application of Sliding Scale*

█ Plaintiffs argue that the cutting of large snags constitutes an irretrievable commitment of resources, and is, for practical purposes, irreparable. They further point to the comments of Dr. Franklin submitted in response to the then-proposed Biscuit Project that salvage logging within the LSR is antithetical to the goal of restoring the viability of the LSR network, and the large snags and logs are essential to the recovery of the LSR. EIS E–25. In its response, the Service stated that Dr. Franklin's comments were specific to the Biscuit Project, and that Franklin and Agee have actually concluded that removing portions of the biological legacy may be appropriate after uncharacteristic stand-replacing events in dry forests. *Id.* The government further contends that an injunction would result in loss of value of salvage timber of $702,000 and 691 jobs in 2004 and 470 jobs in 2005. Ex. 2 at 17–18; Exs. 2, 4.

Considering the evidence and allegations of harm that will result from granting or withholding equitable relief, the interests of the public, and plaintiffs' showing on the merits, the court concludes that preliminary equitable relief is not appropriate in this case.

### *Conclusion*

For the foregoing reasons, plaintiffs' motion for preliminary injunction [# 11] is denied.

IT IS SO ORDERED.