**KLAMATH–SISKIYOU WILDLANDS CENTER, Plaintiff,**

v.

**MEDFORD DISTRICT OF THE BUREAU OF LAND MANAGEMENT, Defendant.**

No. Civ. 04–3077–CO.

United States District Court, D. Oregon.

Oct. 3, 2005.

**1236**

Susan Jane M. Brown, Stephanie M. Parent, Portland, OR, for Plaintiff.

Roger R. Martella, Jr., Benjamin Longstreth, Timothy Racicot, US Department of Justice, Washington, DC, Stephen J. Odell, United States Attorney's Office, Portland, OR, James L. Sutherland, United States Attorney's Office, Eugene, OR, for Defendant.

## ORDER

AIKEN, District Judge.

■ Magistrate Judge Cooney filed his Findings and Recommendation on July 15, 2005. The matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R.Civ.P. 72(b). When a party objects to any portion of the Magistrate's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate's report. 28 U.S.C. § 636(b)(1)(B); *McDonnell Douglas Corp. v. Commodore Business Machines,* 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied,* 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

Plaintiff has timely filed objections. I have, therefore, given the file of this case a *de novo* review. Regarding the first issue raised in the Findings and Recommendation, research logging, I find that the defendant adequately supported its contention that the proposed salvage logging in the research area is consistent with LSR objectives. I agree with Judge Cooney that the defendant gave thorough consideration to whether the proposed salvage would comply with the NWFP, and articulated its analysis in detail. Specifically, the court notes that the FEIS contains a table which addresses compliance with the LSR salvage guidelines and specifically Standard and Guideline # 3 (the retention of snags). The FEIS shows that the largest, hardest snags will be retained and retention will emphasize both pine and douglas fir as they are the most persistent and have greater value for wildlife. The FEIS addresses the number of snags that will be retained and sets forth a thorough snag retention schedule.

This is very different from the record before this court in *Oregon Natural Resources Council v. Brong et al.,* civ. no. 04–693–CO. For example, in *Brong,* this court found that the BLM would average snag retention in salvaged and non-salvaged areas to meet snag retention levels. Here, there is no allegation by the defendant that snag retention levels will be meet by averaging. The defendant here did not act in a arbitrary and capricious fashion regarding proposed salvage logging in research areas.

Next, Judge Cooney examined defendant's proposed logging in nonsuitable woodlands. I agree with Judge Cooney's finding that, unlike the record in *Brong,* the defendant here addressed plaintiff's mitigation concerns with specific data from the record. Judge Cooney held that the defendant demonstrated compliance with the RMP's mitigation requirements, and that *Brong* was distinguishable because of defendant's proposed mitigation measures and the "extensive study and analysis supporting those measures." *See* Findings and Recommendation, p. 24–26. I agree

that the defendant's actions here do not rise to the level of arbitrary and capricious.

Finally, Judge Cooney examined defendant's proposed salvage logging in a deferred watershed and found that the defendant adequately concluded that the proposed activities were unlikely to contribute to the variables that led to the deferred status. I agree with Judge Cooney's findings; specifically, that the level of surface disturbance will be minimal due to high soil infiltration capacity, no new permanent road construction, and use of helicopter logging as the sole means of logging. Unlike the record in *Brong*, the defendant's conclusions here were supported with a thorough analysis of the cumulative effects of the project, and a thorough analysis of the mitigation measures and restoration measures designed to minimize the impacts to the project and other detrimental effects of the fire. I find that Judge Cooney's analysis and recommendation is correct and agree that the defendant was not arbitrary and capricious.

In conclusion, I ADOPT the Magistrate's Findings and Recommendation (doc. 55) that plaintiff's motion for summary judgment (doc. 17) is denied, and defendant's motion to dismiss, or in the alternative for summary judgment (doc. 24), is granted. Further, plaintiff's motion for preliminary injunction (doc. 40) is denied.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

COONEY, United States Magistrate Judge.

Plaintiff Klamath Siskiyou Wildlands Center (KSWC) brings this action against the Medford District of the Bureau of Land Management (BLM) challenging the BLM's decision to allow the Silver Hawk timber sale. Plaintiff alleges the sale vio-lates the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*. Plaintiff seeks declaratory and injunctive relief under FLPMA and pursuant to the judicial review provisions of the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.*. Plaintiff seeks: 1) a declaration that the BLM violated FLPMA by authorizing timber harvest in deferred watersheds and non-suitable woodlands in contravention to the Medford Resource Management Plan (RMP); 2) a declaration that BLM violated FLPMA by failing to ensure that research logging in the Fish Hook/Galice Late–Successional Reserve (LSR) complies with the RMP and the Northwest Forest Plan (NWFP); 3) an order requiring the BLM to withdraw the Final Environmental Impact Statement (FEIS) and the Record of Decision (ROD) until the BLM meets the requirements of FLPMA, the NWFP, and the RMP; 4) an injunction enjoining the BLM and its contractors, assigns, and agents from proceeding with the Silver Hawk timber sale until the court determines that any violations of law are corrected; and 5) an award of costs and attorneys' fees.

Before the court are plaintiff's motion for summary judgment (# 17) and defendant's motion to dismiss or, in the alternative, motion for summary judgment (# 24).

## I. FACTS

The Biscuit Fire began in the Klamath Mountains on July 13, 2002, after a lightning event swept through northwestern California and southwestern Oregon. The fire was active for one hundred twenty days, encompassing 499,965 acres, and was eventually declared controlled on November 8, 2002. Although most of the Biscuit Fire burned on Forest Service lands, approximately 9,028 acres or 2% of the fire area is located on BLM administered land in the Medford District. Five primary

areas of BLM lands were affected by the fire and suppression efforts: North Fork Silver River watershed, Galice Access/Bear Camp Road, the Eight Dollar Mountain Area of Critical Environmental Concern, Woodcock Mountain, and Whiskey Creek. (BLM ROD at 2).

The Notice of Intent to prepare an EIS and conduct public scoping to assess land management options after the Biscuit Fire was published in the Federal Register on March 19, 2003. The public comment period for the Biscuit Fire Recovery Project Draft EIS began on November 22, 2003 and ended on January 20, 2004. (AR 695).

The Biscuit Fire Recovery Project FEIS was released on June 4, 2004, and the 30–day public review period ended July 6, 2004. (AR 488). The decision to implement post-fire salvage logging after the Biscuit Fire was split into four RODs: 1) salvage logging on Forest Service LSR land allocations; 2) salvage logging on Forest Service Matrix land allocations; 3) salvage logging in Forest Service inventoried roadless areas; and 4) salvage logging on BLM lands. (BLM ROD).

All the RODs adopted Alternative 7 from the FEIS for implementation. On BLM lands, Alternative 7 permits area salvage operations on approximately 195 acres, producing approximately 2.75 million board feet of salvage. (AR BLM ROD at 10). Most of the acres to be salvaged, 157 acres in 9 units, are located in the Silver Creek LSR, and 38 acres will be salvage logged in two units from BLM matrix land allocations. All acreage will be helicopter logged, and three new helicopter landings will be constructed for this purpose. Approximately 2.6 miles of previously closed roads will be reopened to facilitate logging operations and .1 miles of temporary spur roads will be constructed. More than 65 miles of existing roads will be maintained and improved. (BLM ROD at 4).

In addition, Alternative 7 will implement Learning Opportunities. (BLM ROD at 7). Salvage logging will occur in Learning Opportunities Pathway A and salvage logging and landscape burning will occur in Learning Opportunities Pathway C. Both Learning Opportunities will take place on land designated as LSR. (BLM ROD at 10, Map 1, and Map 2). The Learning Opportunities are designed "to explore different ways to restore late-successional habitat in the Reserves given the high uncertainties in how to achieve this objective." AR FEIS A–11.

Learning Opportunity Pathway A "emphasizes salvaging dead trees where consistent with Reserve Standards and Guidelines", as well as treating fuels, replanting, and stand culturing. AR FEIS A–11. Under Pathway A,

> Salvage would occur where assumed to be beneficial to late-successional-habitat objectives (areas where there are at least 10 acres of dead trees and where crown closure has been reduced below 40%), and economically feasible in Vegetation Change Classes 2, 3, and 4. Standing-dead and downed trees would be left in accordance with the Siskiyou Forest Plan to accelerate development of the conditions needed for species that depend on late-successional forests (large downed wood, snags). Fuels management would focus on treating fuels created during management activities, including broadcast burning, pile burning, and lop and scatter.

AR FEIS A–11—A–12.

Learning Opportunities Pathway C emphasizes

> reintroduction of landscape-scale, high-frequency, low-intensity fore; salvaging dead trees where consistent with reserve Standards and Guidelines; replanting conifers and reducing fuels. Pathway C differs from A by using pre-

scribed fire at a landscape scale and by limiting salvage to 2 miles from a road; leave trees and down wood would be the same as for pathway A. . . .

AR FEIS A–12.

The FEIS found that all the research logging "would meet all NWFP guidance . . .". AR FEIS E–69.

The FEIS states that the proposed treatments "are designed to either aid or not impede maintenance or restoration of desired future late successional forest habitat". AR FEIS E–53. The FEIS contains a chart which sets forth the NWFP S & Gs for salvage logging; C13–15. AR FEIS E–68–69. This chart summarizes the S & G and states how the salvage will comply with the S & Gs. Id. The FEIS concluded that:

> Salvage should not diminish late successional habitat suitability now or in the future, because salvage activities would be consistent with NWFP ROD (C–14 to C–16) guidelines for salvage. NO merchantable live trees are planned for harvest (a very conservative definition of "live" is used: no live branches), salvage would only occur in openings greater than 10 acres, dead wood in salvage units is retained in the appropriate amounts—which are based on province level guidelines, dead wood retention requirements would leave the most persistent sizes and species, leave soft down wood, and the species composition of largest dead wood would approximate the original stand. Most importantly, salvage amounts are conservative: of Biscuit Fire acres within LSR, the amount of salvage proposed in the preferred alternative is 11% of areas dominated by 9–21" dbh snags, 15% of areas dominated by 21–32" dbh snags, 26% of areas dominated by greater than 32" dbh snags, and 15% of all these size classes combined (greater than 9" dbh). Of the acres within the more ecologically significant LSR network (wilderness plus LSR) within the fire area, the amount of salvage proposed in the preferred alternative if 6% of the areas dominated by 9–21 dbh snags, 8% of areas dominated by 21–32" dbh snags, 16% of areas dominated by greater than 32" dbh snags, and 8% of all these size classes combined (greater than 9" dbh).

AR FEIS E–60–61.

Regarding the retention of snags, the FEIS, states that:

> Salvage operations will only target dead trees (trees with no live limbs). Salvage operations will avoid late successional forest habitat (patches larger than 2 acres) in LSRs. Activities are designed to provide for current and future snag and CWD [coarse woody debris] needs (FEIS Dead Wood report). . . .
>
> Activities are designed to provide for current and future snag and CWD needs (FEIS Dead Wood report). . . .
>
> Conservative quantities of salvage are planned: salvage is proposed in only 8 percent of areas dominated by snags > 9" dbh in the Biscuit Fire area, 8% of LSR + wilderness in the Biscuit Fire area, and at the stand scale roughly 50% will not be salvaged due to very limited disturbance of Riparian Reserves. Of the largest size class of dead wood, > 32" dbh, about 26% of LSRs and only 16% of the more ecologically significant LSR + wilderness area is proposed for salvage in the preferred alternative.

\* \* \* \* \* \*

> Retain largest hard-snags, as they are more persistent, and emphasize retention of pine and douglas-fir, as they are persistent and have greater value for wildlife than other species. Douglas fir is the most common large snag in the recovery area. Local data from ecoplots was used to establish guidelines for re-

taining largest available snags. See Deadwood report for retention levels for varying site conditions. Average snags retained per acre should be from 3.8 to 6.6.

FEIS Appendix E–60–61, E–68, App. G 20–21. This chart states that salvage will not occur in areas with limited amounts of snags, the largest snags will be retained to meet provincial amounts, and to meet the persistence needs species composition will approximate historic composition. Id.

In addition, the FEIS contains a Dead Wood Report. AR FEIS Appendix G. This report details the percentage of snags proposed for harvest under each alternative. AR FEIS G–13 and G–15. The snag retention scheme requires average retention levels of 1.5 to 13.5 snags per acres, depending on several factors, including burn severity, aspect, plant community, and management considerations. AR FEIS App. G –15–16.

On April 22, 2004, the Regional Ecosystem Office (REO) issued a LSR Compliance Approval Letter. AR FEIS E–47. The REO concurred with the agency's finding that all the proposed activities in LSRs within Alternative 7 were consistent with the NWFP, including salvage treatments. Id.

834.7% of the acres in the Silver Creek watershed have been managed in the past. (FEIS III–102). The North Fork Silver Creek sub-watershed was designated as a deferred watershed during the resource management planning. As a result of this designation, logging and management activities within watersheds designated as deferred was prohibited for a period of at least 10 years, pending reevaluation in the next planning cycle and beginning with the adoption of the Medford ROD in June 1995. (RMP AR at 42).

The entire Silver Hawk timber sale lies within a Tier 1 Key Watershed. (BLM ROD at 6). The lands affected by the Silver Hawk timber sale lie predominately within the Fish Hook/Galice LSR. (BLM ROD at 5). This LSR is also designated as Northern Spotted Owl Critical Habitat Unit (CHU) OR–65. (AR 15536, C–2–C–3).

## II. *LEGAL STANDARDS*

 The court reviews an agency's decision under the arbitrary and capricious standard. *See Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149 (9th Cir. 1998); *Northcoast Environmental Center v. Glickman,* 136 F.3d 660, 666–667 (9th Cir.1998); *Greenpeace Action v. Franklin,* 14 F.3d 1324 (9th Cir.1993). The arbitrary and capricious standard requires the court to ensure that an agency has taken the requisite "hard look" at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is "founded on a reasoned evaluation 'of the relevant factors' " and whether there has been clear error in judgment. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)(quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The inquiry must be searching and careful, but the standard of review is a narrow one. *Id.* An agency's decision may only be called arbitrary and capricious if the agency: relied on factors which Congress did not intend it to consider; entirely failed to consider an important aspect of the problem; offered an explanation for its decision that runs counter to the evidence before the agency; or offered an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Southwest Center for Biological Diversity v. U.S. Forest Service,* 100 F.3d 1443, 1448 (9th Cir.1996) (citation omitted).

FLPMA mandates the development of a Resource Management Plan (RMP). 43

U.S.C. § 1712. FLPMA and its implementing regulations require the BLM to manage lands in compliance with the requirements of the RMP. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5–3(a). The Medford RMP is the land use plan for all projects within the BLM's Medford District. Failure of a project to comply with the requirements of the RMP is a violation of FLPMA and its implementing regulations.

In 1994, the BLM and the USFS issued a ROD for the NWFP. The NWFP established management requirements for all BLM and USFS lands within the range of the northern spotted owl. The Medford District lies within the range of the northern spotted owl and its RMP incorporates the requirements of the NWFP. (NWFP ROD). The RMP contains certain land allocations created by the NWFP, including: 1) LSR; 2) Adaptive Management Areas; 3) Riparian Reserves; and 4) Matrix. (AR RMP at 3). Each land allocation is governed by a different set of Standards and Guidelines (S & Gs).

## III. *DISCUSSION*

Plaintiff presents the following issues to be decided:

1) Did the defendant violate the FLPMA by permitting research logging in the Fish Hook/Galice LSR?

2) Did defendant violate FLPMA by permitting timber harvest on non-suitable woodlands? and

3) Did defendant violate FLPMA by permitting salvage logging that will have additional cumulative impacts in deferred watersheds?

*Research Logging in LSRs*

█ Plaintiff argues that the BLM has failed to demonstrate that: 1) the research logging projects in the Fish Hook/Galice LSR are consistent with LSR objectives; 2) the research logging projects will test critical assumptions of the NWFP; and 3) there are no equivalent research opportunities outside LSRs. Specifically, plaintiff argues that BLM has failed to demonstrate that the research projects are consistent with the development of old-growth characteristics including snags, and the research projects violate the NWFP S & Gs C–13 by targeting old-growth snags for removal. Plaintiff relies upon language in the NWFP FEIS, which discusses the important role that snags play in late-successional forests, AR NWFP S & Gs B–5; AR FEIS III15 and III–87, and AR NWFP S & Gs C–13. Plaintiff also relies upon comments from Dr. Franklin, in which he criticizes salvage logging in LSRs, stating in part that salvage logging of large snags and downed boles does not contribute to the recovery of late-successional reserve forest habitat and that none of the large snags and logs of decay-resistant species can be judged as excess of those needed for natural recovery to late-successional forest conditions. Dr. Franklin concluded that it is inappropriate to carry out an active salvage program that would interfere with natural recovery processes. Plaintiff also argues that the BLM did not specifically address, in the FEIS, the issue of whether or not research logging that involves aggressive salvage logging was consistent with the NWFP S & Gs for LSRs.

Defendants argue that:

1) the proposed research activities are consistent with the NWFP S & Gs C–13—C–16 as evidenced by the FEIS and the BLM ROD, citing FEIS Appendixes E, G, J, BLM ROD at 5, and III–179;

2) the FEIS demonstrates that the BLM gave thorough consideration to whether the proposed salvage would comply with the NWFP, and it articulated that analysis in detail as evidenced by Appendix E at 68–69, where the FEIS

details compliance with eleven S & Gs, as well as the entire NWFP as evidence in AR FEIS III–179;

3) the BLM's determination that the research activities are consistent with the NWFP is supported by the Regional Ecosystem Office (REO) Appendix E–48;

4) plaintiff cannot show that the BLM abused its discretion is assessing compliance with the NWFP;

5) the court cannot second guess the BLM's expertise even if Dr. Franklin's opinion differs;

6) the BLM considered and incorporated Dr. Franklin's perspective in the FEIS;

7) *ONRC v. Brong*, 2004 WL 2554575 (D.Or.) is distinguishable from this case.

In response and reply, plaintiff argues that:

1) the BLM has failed to demonstrate compliance with the specific research logging standard which requires the BLM to meet LSR objectives, including the development of old-growth characteristics including snags;

2) the salvage logging will interfere with the development of old-growth characteristics including snags by removing snags that are likely to persist until the next stand develops, and the BLM has failed to demonstrate that snag removal will not interfere with the development of old-growth characteristics;

3) the logging violates the general salvage guidelines by targeting old-growth snags for removal which will diminish habitat suitability now and in the future according to Dr. Franklin;

4) the sale violates the general salvage guidelines which provide that management should focus on retaining snags that are likely to persist until late-successional conditions have developed and the new stand is again producing large snags;

5) the BLM has failed to demonstrate that the research logging will test critical assumptions of the NWFP or that there are no equivalent research opportunities outside the Fish Hook/Galice LSR;

6) the REO's interpretation of the project's consistency with the NWFP is not entitled to deference;

7) the analysis in *Brong* controls in this case and the preliminary injunction ruling in *SREP v. Goodman*, 2004 WL 1737738 (D.Or.) is not controlling; and

8) plaintiff is challenging the BLM's compliance with the general salvage guidelines.

In reply, defendants argue that:

1) the BLM has shown that the proposed salvage logging is consistent with LSR objectives—the salvage of fire killed trees is permitted in LSR if it complies with the eleven guidelines—these guidelines ensure that salvage will enhance and protect late-successional and old-growth ecosystems and the BLM has shown compliance with these guidelines;

2) the BLM considered whether the salvage would result in denigration of suitable habitat and whether it would prevent negative effects and concluded that it would not diminish habitat suitability Appendix E 51–52, 60–61, and 68;

3) the BLM is not required to retain all large snags to satisfy S & G # 3—the NWFP salvage guidelines permit the recovery of timber when a catastrophic event kills more trees that are needed to maintain late-successional conditions—the BLM's interpretation of the NWFP is entitled to deference;

4) plaintiff's interpretation of S & G # 3 was rejected by Judge Hogan in *Cascadia Wildlands Project v. Goodman*, 2004 WL 2958420 at 13 (D.Or.2004);

5) the BLM's interpretation of S & G # 3 is consistent with the language of other salvage guidelines and with the purpose of the guidelines as a whole; 6) plaintiff's interpretation of S & G # 3 would render the LSR salvage guidelines superfluous; 7) the REO's determination of compliance with the NWFP is entitled to deference; 8) plaintiff fails to identify any analogous facts to *Brong*; and 9) Judge Hogan's decision in *SREP* is rational and compelling.

The NWFP provides that:

Late-successional reserves are to be managed to protect and enhance old-growth forest conditions. For each late-successional reserve (or group for small reserves) managers should prepare an assessment of existing conditions and appropriate activities. No programmed timber harvest is allowed inside the reserves. However, thinning or other silvicultural treatments inside these reserves may occur in stands up to 80 years of age if the treatments are beneficial to the creation and maintenance of late-successional forest conditions. In reserves east of the Cascades and in Oregon and California Klamath Provinces, additional management activities are allowed to reduce the risk of large scale disturbances. Salvage guidelines are intended to prevent negative effects on late-successional habitat..... Thinning or other silviculture activities must be reviewed by the Regional Ecosystem Office and the Regional Interagency Executive Committee.

NWFP ROD at 8.

The NWFP allows for direct silvicultural management of LSRs "following disturbances such as extensive, high severity fires." NWFP ROD at B–8. The NWFP requires the BLM to manage LSRs to "protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth related species." (NWFP S & G C–12). The NWFP contains eleven general salvage guidelines which are intended to prevent negative effects on late-successional habitat, while allowing salvage logging. NWFP ROD C–13–16.

The NWFP states that:

Tree mortality is an important and natural process within a forest ecosystem. Diseased and damaged trees and logs are key structural components of late-successional and old-growth forests. Salvage of dead trees affects the development of future stands and habitat quality for a number of organisms. Snag removal may result in long-term influences on forest stands because large snags are not produced in natural stands until trees become large and begin to die from natural mortality. Snags are used extensively by cavity-nesting birds and mammals such as woodpeckers, nuthatches, chickadees, squirrels, red tree voles, and American marten. Removal of snags following disturbance can reduce the carrying capacity for these species for many years....

Provision for retention of snags and logs normally should be made, at least until the new stand begins to contribute coarse woody debris.

NWFP ROD B–8–9.

The NWFP imposes restrictions on conducting research activities within LSRs. The NWFP requires that:

These activities must be assessed to determine if they are consistent with Late–Successional Reserve objectives. Some activities (including those within experimental forests) not otherwise consistent with the objectives may be appropriate, particularly if the activities will test critical assumptions of these

standards and guidelines, will produce results important for habitat development, or if the activities represent continuation of long-term research. These activities should only be considered if there are no equivalent opportunities outside Late–Successional Reserves. (NWFP ROD C–18).

One of the LSR objectives is the development of old-growth forest characteristics including snags. NWFP ROD B–5. Snags are considered critical parts of late-successional forests and the wildlife and plant life depend upon them for survival. NWFP ROD B–5; AR FEIS III–15, III–87.

The NWFP S & Gs permit salvage logging in LSRs under certain conditions. NWFP ROD C–13. The NWFP S & Gs state that "priority should be given to salvage in areas where it will have a positive effect on late-successional forest habitat" and that "salvage operations should not diminish habitat suitability now or in the future." NWFP ROD C–13.

The NWFP S & Gs regarding salvage logging provide in part that:

Snags provide a variety of habitat benefits for a variety of wildlife species associated with late-successional forests. Accordingly, following stand-replacing disturbance, management should focus on retaining snags that are likely to persist until late-successional conditions have developed and the new stand is again producing large snags. Late-successional conditions are not associated with stands less than 80 years old.

NWFP ROD C–14.

The FEIS found that all the research logging "would meet all NWFP guidance ...". AR FEIS E–69. The FEIS contains a chart which sets forth the NWFP's eleven general guidelines for salvage logging. AR FEIS E–68–69. This chart summarizes the S & Gs and states how the salvage, which includes salvage from research logging, will comply with the S & Gs. Id.

The FEIS also contains a finding that the activities will not diminish late successional habitat now or in the future. AR FEIS App. E–51–52, 59–61, 68–69. The FEIS found that all the research logging "would meet all NWFP guidance ...". AR FEIS E–69. In addition, the record shows that the REO confirmed that all activities under Alternative 7, are in compliance with the NWFP. AR EIS App. E–48; ROD at 5.

This court finds that Judge Hogan's opinion in *SREP v. Goodman,* 2004 WL 1737738 (D.Or.) is directly on point and applicable to this case. Judge Hogan's opinion addresses the issues of consistency with LSR objectives, snag retention, and research logging in LSRs. *Id.* at *5–7.

In this case, the BLM relied upon the same information as the Forest Service in determining that the salvage logging, which includes the proposed research logging, is consistent with LSR objectives and it will not diminish habitat now or in the future. *Id.* at *5–6. In this case, plaintiff relies on the opinion of Dr. Franklin to demonstrate that the proposed salvage logging, including research logging, is inconsistent with LSR objectives. The BLM "supports its conclusions with a through discussion and reasoned analysis, the court's function is not to referee disputes between scientists." *Id.* at *6.

With regard to snag retention, this court finds that Judge Hogan's analysis is also applicable. As with the Forest Service, the BLM relies upon the same record. The FEIS contains a table which addresses compliance with the LSR salvage guidelines and the this table shows compliance with S & G # 3 regarding the retention of snags. AR FEIS E–68. The FEIS shows that the largest, hardest snags will be retained and retention will emphasize pine and douglas fir as they are the most persistent and have greater value for wildlife.

*Id.* The FEIS also addresses the number of snags that will be retained and sets forth a "complicated snag retention scheme". AR FEIS App. G 20–21. This court agrees with Judge Hogan that the court should not second guess the BLM's "conclusion that the dead wood prescription will insure sufficient CWD so as to comply with S & G # 4." *Id.*

Judge Hogan's opinion also addressed the issue of research logging. As in *SREP,* the BLM in this case found that "all of the treatments within the Learning areas are the same as those described previously and would meet all NWFP guidance as described in other sections." *Id.* at *7 citing FEIS App. E–68. The BLM has demonstrated that the research logging is consistent with LSR objectives, and the court "should not second guess" this conclusion, which is supported by thorough discussion and reasoned analysis. *See Id.* at *5–7.

The court finds that Judge Aiken's opinion in *ONRC v. Brong,* 2004 WL 2554575 (D.Or.) is factually distinguishable from this case. In this case, unlike in *Brong,* the BLM set forth a through discussion of snag retention and demonstrated how the proposal conforms with the NWFP S & Gs. In addition, the BLM in this case specifically addressed the comments made by Dr. Franklin in the FEIS. AR FEIS 1–21–31.

*Nonsuitable Woodlands*

Plaintiff argues that the Silver Hawk timber sale violates the Medford RMP by allowing salvage logging on 195 acres of land that are nonsuitable woodlands. Plaintiff points to the following evidence to demonstrate that the land is nonsuitable woodlands:

1) the FEIS includes Map III–1 which indicates where "skyline units in high severity burn, high erosion potential soils" and all the Silver Hawk units appear to fall within this description;

2) the FEIS states that "there are proposed salvage units located on sites with soils classified as very high erosion potential in all alternatives except for Alternative 4 ... There are also proposed landscape prescribed burning in areas identified on those same soil types in Alternative [ ] ...7 (about 3,500 acres)." III–67; III–97;

3) the FEIS indicates that Alternative 7 will take place in "high burn severity/high erosion potential areas." AR FEIS II–40;

4) the FEIS demonstrates that the potential for erosion is high in the Silver Creek watershed because of steep slopes and high precipitation rates AR FEIS III–201;

5) the FEIS states that salvage logging will occur on "timberland unsuitable due to poor reforestation success" AR FEIS II–49;

6) the FEIS states that salvage logging in fuel management zones may result in soil compaction on areas where logging occurs on flatter ridge tops using tractors AR FEIS III–98 and AR FEIS Map 2–3; and

7) the construction of several landings will result in additional ground-based adverse effects AR FEIS III–99.

Defendant argues that:

1) the plaintiff waived any argument regarding nonsuitable woodlands by failing to raise this claim during the administrative process; and

2) the salvage on 24 acres of nonsuitable woodlands is permitted, because of adequate mitigation measures.

In response and reply, plaintiff argues that:

1) the nonsuitable woodlands claim is properly before the court—plaintiff submitted an extensive protest addressing the effects of the proposed logging on

soils, steep and unstable slopes, and deferred watersheds, and raised the issues of whether the proposal complied with the applicable NWFP and RMP standards and land allocations;

2) plaintiff informed the BLM that it would litigate the Silver Hawk timber sale on the same grounds as the Timbered Rock timber sale, which included the issue of salvage logging on nonsuitable woodlands;

3) the record indicates that the entire planning area is composed of nonsuitable woodlands, and not just 23.45 acres and this post hoc rationalization should not be given deference;

4) the fact the area to be harvested is small does not mean the effects are not great;

5) there is no distinction between timber harvest and salvage, because either constitutes a surface disturbing activity which is prohibited under the RMP and *Brong* applies to this case;

6) regardless of mitigation measures, the RMP prohibits the activity at issue;

7) *SREP* is distinguishable from this case, because it addressed the efficiency of the Forest Service's mitigation measures, the restrictions on nonsuitable woodlands did not apply to the Forest Service, this case involves soils burned at high severity, highly erosive soils, steep slopes, and high precipitation rates, not mass wasting or landslides— the BLM has not demonstrated that the mitigation measures for mass wasting and land slides are applicable to the conditions present in this case.

In reply, defendant argues that:

1) the salvage of dead trees in nonsuitable woodlands complies with the RMP;

2) plaintiff failed to raise this issue in the administrative process;

3) the RMP specifically permits salvage on nonsuitable woodlands; and

4) the BLM has shown that it has mitigated the effects of the salvage operation.

The Medford RMP provides in part that nonsuitable woodlands, which includes all landslide prone areas and other unstable soils, are not suitable for timber harvest. Medford RMP at 41. The NWFP S & Gs does not consider the salvage of dead trees a silviculture prescription. NWFP ROD C–13. However, the Medford RMP prohibits other surface-disturbing activities on nonsuitable woodlands "unless adequately mitigated to maintain site productivity and protect water quality." Medford RMP at 41.

The Medford RMP defines nonsuitable woodlands as "all fragile nonsuitable forest land." Id. at 108. Fragile nonsuitable forest land is defined as

A Timber Production Capability Classification indication forest land having fragile conditions, which, if harvested, would result in reduced future productivity; even if special harvest or restrictive measures are applied. These fragile conditions are related to soils, geologic structure, topography, and ground water.

Id. at 105.

Plaintiff made extensive comments in its protest of the proposed project. AR 273–356. These comments addressed the effects of the proposed salvage on soils, steep and unstable slopes, and deferred watersheds. *Id.* Plaintiff also raised the issue of the projects compliance with the NWFP and the RMP. *Id.* The court finds that the plaintiff adequately raised this issue, based on the extensive comments made in support of its protest. *See ONRC v. Brong,* 2004 WL 2554575 (D.Or.) at *8.

The court also finds that the proposed salvage logging is not "timber harvest", but would be considered "other

ground disturbing activities" under the RMP, and that plaintiffs have demonstrated that the proposed project will take place on lands which qualify as nonsuitable woodlands [1]. However, the RMP allows other ground disturbing activities on non-suitable woodlands if adequately mitigated. *Id.* at *9.

 The court finds that Judge Hogan's opinion in *SREP* is applicable to this case on the issues of mitigation measure to prevent land slides and sedimentation from the project. The BLM relied upon the same information, analysis, and mitigation measures as the Forest Service in making its decision. *See SREP,* 2004 WL 1737738 at *7–9.

The FEIS discusses potential impacts of salvage logging, fuel management zone activities, landscape burning, fuels treatment, reforestation, and road work on mass wasting. FEIS III—86, 88–92. The FEIS discusses potential impacts and mitigation measures taken to combat the potential impacts, including "the removal of active landslide areas from skyline or tractor logging, retaining 70% or more snags on inactive or historically active landforms to decrease impacts of logging activities, limiting construction of temporary roads to slopes with less than 30% gradient and outside of riparian areas, review of helicopter landing sites by geology personnel .... EIS III—83, 87, 92." *SREP,* 2004 WL 1737738 at *8.

The FEIS examines impacts of the project on erosion and sedimentation, aquatic habitat, water quality, and threatened fish. FEIS III—78, 83, 86–92, 199–292, Apps. F, K). The FEIS discusses mitigation measures to lessen impacts from activities associated with the project, including applying rock to roads to prevent sediment delivery. FEIS III—259–260.

The FEIS also provides for a field review to determine site-specific conditions including soil types, existing compaction, evidence of surface erosion and instability, the presence of large woody material and the potential for litter recruitment. FEIS III—83. This information will be used to help design and adjust unit boundaries, to identify soil and riparian concerns, to assign specific mitigation measures, and for future monitoring. *Id.*

The court finds that the BLM has demonstrated compliance with the RMP's mitigation requirements, and that the effects of the project on soils and water quality will be adequately mitigated. The court also finds that *Brong* is distinguishable from this case, because of the proposed mitigation measures and the extensive study and analysis supporting those measures.

*Cumulative Impacts in Deferred Watershed*

 Plaintiff argues that Silver Hawk timber sale violates the Medford RMP by allowing salvage logging in deferred watersheds that will result in additional cumulative impacts to these watersheds. Plaintiff relies on the following evidence to support its argument:

1) the FEIS states that salvage logging, even with helicopter logging, will result in the loss of more green tree canopy AR FEIS III–177–178;

2) the BLM is proposing to build additional new roads, open 2.6 miles of previously closed roads, and maintain or improve 65 miles of existing roads AR BLM ROD at 4;

3) the Silver Hawk timber sale will increase the rate of surface erosion in the short-term AR FEIS III–95;

---

**1.** The court denies plaintiff's motion to strike the Kerwin declaration as moot; it is unnec-

essary to determine how many acres are actually unsuitable woodlands.

4) logging activities will increase sediment delivery AR FEIS III–248, 250;

5) road work will increase the compacted areas in the watershed AR FEIS III–98–99;

6) slash busting activities and landing creation will result in increased cumulative effects AR FEIS III–98–99;

7) off-road vehicle use has increased cumulative effects AR FEIS III–103; and

8) permanent fuel management zones will retain the open condition of the planning area AR FEIS III–103, 300.

Defendant argues that:

1) the Medford RMP permits the proposed salvage in the Silver Creek Watershed;

2) the BLM concluded that the proposed activities are unlikely to contribute to the variables that led to the deferred status, because the level of surface disturbance will be minimal due to high soil infiltration capacity, no new permanent road construction, and use of helicopter logging as the sole means of logging AR FEIS III–95–96;

3) the BLM reasonably concluded that the mitigation measures imposed will prevent further cumulative effects on the watershed;

4) plaintiff fails to establish that the BLM abused its discretion in determining that the salvage would not increase cumulative impacts; and

5) *Brong* is distinguishable from this case.

In response and reply, plaintiff argues that:

1) because the Silver Hawk timber sale will have additional cumulative effects in a deferred watershed, the BLM's decision is arbitrary and capricious and violates FLPMA;

2) *Brong* is controlling in this case;

3) the Silver Hawk timber sale will have additional cumulative effects from road activity, the creation and maintenance of fuel management zones, increased off-road vehicle use, the removal of green canopy, prescribed burning, and erosion;

4) the fact that conditions in the watershed have improved does not mean that the salvage logging can go forward; and

5) plaintiff is entitled to injunctive relief.

In reply, defendant argues that:

1) the deferral in the North Fork Silver Creek expired two years ago and management activities are permitted if the effects will not increase the cumulative effects;

2) plaintiff has not shown the agency abused its discretion regarding its conclusions on cumulative effects to the deferred watersheds;

3) the agency took a hard look at effects from soil compaction, the creation of fuel management zones, the potential for increased off-road vehicle use, and other effects and plaintiff's evidence does not demonstrate that the proposed activities will increase cumulative effects to the deferred watershed;

4) plaintiff has not shown that any increased erosion will have cumulative effects on the Silver Creek's deferred status;

5) the agency has shown that the restoration work will reduce impacts from past projects, and, although the project may have some environmental effects, overall the project will not increase the cumulative impacts in the subwatershed—this approach is rational and allowed under the RMP;

6) the FEIS's cumulative impacts discussion does not demonstrate cumulative effects that will further the watershed's deferred status; and

7) plaintiff is not entitled to injunctive relief.

Beginning in January 1993, the Medford RMP deferred the Silver Creek watershed from management activities for ten years. Medford RMP at 42. The RMP allows limited management activities such as salvage, if the effects will not increase the cumulative effects. *Id.*

In the ROD, the BLM concluded that:

Activities in this decision will not further degrade this watershed as restoration activities will serve to decrease the effects of past actions and of the Biscuit Fire. Openings have been created by the fire, which has added to the cumulative effects, however, project activities will not exacerbate these effects. Silver Creek is a Tier 1 Key Watershed (RMP), contributing directly to conservation of at-risk anadromous salmonids. This decision will have no effect on the parameters that make this a Tier 1 Key Watershed. Salvage will not alter the existing canopy, thereby continuing the function and processes necessary for the conservation of these species. FEIS III—264-268.

BLM ROD at 6. The FEIS also found that the proposed activities are unlikely to contribute to the variables that led to the deferred status, because the level of soil disturbance will be minimal due to: 1) high soil infiltration capacity; 2) no new permanent road construction; and 3) helicopter use as the sole logging method. FEIS III –95–96.

In responding to the plaintiff's protest, the BLM stated in part that:

The deferral was based on hydrologic conditions at that time due to concern about 1) the Silver Fire (1987) in the watershed downstream from BLM land, 2) levels of soil disturbance from timber harvest activities prior to that time, and 3) water temperature concerns downstream. The watershed is also an environment of "steep slopes," "high rainfall," and "high stream flows." (See RMP Appendix U.) Since the deferral was made, the indicator conditions have stabilized and improved. Since that time the BLM has also fully decommissioned approximately 13 miles of road. Hydrologic conditions that contributed to the deferral have substantially improved, particularly overall road source sedimentation levels and water quality impacts. As pointed out in the Biscuit Fire FEIS (III–95), "The proposed actions are not likely to contribute to the variables that led to the deferred status of the BLM portion of the North Fork Silver Creek Watershed. Factors leading to low levels of surface disturbance include: 1) High infiltration capacity, 2) No new permanent road construction, and 3) Helicopter use as the primary logging method. The level of surface disturbance will be minimal and should not contribute to the conditions that led to the deferred status."

The Silver Hawk Timber sale has been designed (e.g., minimal new road construction, road closures and decommissioning after use, road renovations to remedy existing road problems, helicopter logging) so as not to contribute to increased overall cumulative hydrologic effects. While the Biscuit Fire changed conditions, the Silver Hawk timber sale is not likely to contribute to the variables that led to the 10 year deferral. Hydrologic cumulative effects of the fire include increases in periodic stream peak flows and increase in sediment and bedload during snow events and to the same degree with or without the proposed salvage logging. The Silver Hawk project includes the requirement that all re-opened logging roads and the spur road would be fully decommissioned, and landings to be located on

ridge tops and decommissioned after use.

Federal Defendants' Exhibit F at 000097.

The BLM concluded that the salvage logging is not likely to contribute to the variables that led to the 10 year deferral, and that the hydrologic cumulative effects of the fire will occur to the same degree with or without the proposed salvage logging. The BLM has supported this conclusion with a thorough analysis of the cumulative effects of the project, and a thorough analysis of the mitigation measures and restoration measures designed to minimize the impacts of the project and the detrimental effects of the fire. These measures include conducting all logging by helicopter to reduce impacts, proposed measures to prevent off-road vehicle use such as physical barriers and signs, the decommissioning of roads, and the restoration of roads, locating the temporary spur road and helicopter landings in areas that will not impact aquatic resources, increasing ground cover, the use of Best Management Practices, use of sediment buffering AR 00097–000098, 000107–000109. The court "should not second guess" this conclusion, which is supported by thorough discussion and reasoned analysis. *See SREP* at *5–7.

The court finds that this case is distinguishable from *Brong.* In *Brong,* Judge Aiken found that the cumulative impacts analysis was inadequate, in violation of NEPA. *Brong,* 2004 WL 2554575 at *13–15. In this case, plaintiff is not challenging the adequacy of the cumulative impacts analysis.

### III. *RECOMMENDATION*

Based on the forgoing, it is recommended that plaintiff's motion for summary judgment (# 17) be denied and defendant's motion to dismiss or, in the alternative, motion for summary judgment (# 24) be granted.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. Thereafter, the parties have ten days within which to file a response to the objections. Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

July 15, 2005.